**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Stefan Bogdanovich (State Bar No. 324525)
Ines Diaz Villafana (State Bar No. 354099)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone:  (925) 300-4455
Facsimile:  (925) 407-2700
Email: ltfisher@bursor.com
        sbogdanovich@bursor.com
        idiaz@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARISSA PORCUNA, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| CRAZY MAPLE STUDIO, INC., | <u>**JURY TRIAL DEMANDED**</u> |
| Defendant. | |

Plaintiff Marissa Porcuna ("Plaintiff"), by and through her attorneys, brings this action on behalf of herself and all others similarly situated.  Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself and her counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a class action suit brought against Defendant Crazy Maple Studio, Inc. ("CMS" or "Defendant") for violating the Video Privacy Protection Act ("VPPA") and California Civil Code § 1799.3.

2.      Defendant owns and operates its website reelshort.com (the "Website" or "ReelShort"), a video streaming website featuring short-form video episodes of serialized dramas. Consumers access the site through their browsers at reelshort.com.  The Chief Executive Officer of ReelShort, Joey Jia, has explained that the Website operates on a "pay-as-you-go model," where customers watch multiple minute-long episodes before being asked to pay to keep watching or to watch ads to unlock new content.[1]  Defendant provides users with pre-recorded videos via its Website.

3.      Defendant has installed a "tracking pixel" on its Website, which hosts the videos for streaming.  This tracking pixel surreptitiously sends consumers' viewing activities to third-party providers like Meta Platforms, Inc. ("Meta") without consent, in violation of the Video Privacy Protection Act ("VPPA"), 18 U.S.C § 2710, *et seq.*

4.      Congress has recognized that "films are the intellectual vitamins that fuel the growth of individual thought."  S. Rep. No. 100-599, at *7 (Oct. 21, 1988) (citing Senate Judiciary Subcommittee on Technology and Law, Hearing Tr. at 10 (Aug. 3, 1988)).  As the Committee on the Judiciary explained when considering the VPPA, "[Privacy] is an issue that goes to the deepest yearnings of all Americans that we are free and we cherish our freedom and we want our freedom. We want to be left alone."  *Id*. at *6.  The VPPA was meant to give consumers the power to

---

[1] "Minute-Long Soap Operas Are Here. Is America Ready?," *NY Times* https://www.nytimes.com/2024/01/30/technology/reelshort-video-app.html.

"maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers." *Id*. at *8. "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." *Id*.

5.      Specifically, Defendant violated the VPPA by knowingly disclosing the personally identifiable information ("PII") of Plaintiff and the class members to Meta without their consent. To do so, behind the scenes of its videos, Defendant installed computer code on its Website called the "Meta Pixel," which—unbeknownst to Plaintiff and the members of the Class—tracks and records Plaintiff's and the Class Members' private video consumption and discloses it to Meta without their consent. Meta, in turn, uses Plaintiff's and the Class Members' video consumption habits to build profiles on consumers and deliver targeted advertisements to them, among other activities.[2]

## THE PARTIES

6.      Plaintiff Marissa Porcuna is a citizen of California who resides in Bay Point, California. Plaintiff created a ReelShort account and has accessed her account to watch ReelShort videos as recently as February 2024. Plaintiff accesses ReelShort on the same browser she uses to access her Facebook account, which she created using her real name. During her time using her ReelShort account, Plaintiff has made purchases for coins on the Website in order to watch videos.

7.      Defendant Crazy Maple Studio, Inc. is a California corporation with its principal place of business at 1277 Borregas Ave, Sunnyvale, CA 94089. Defendant owns and operates reelshort.com, which is used throughout California and the United States.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the VPPA). This Court also has supplemental jurisdiction over the California state law claims because they arise from the same

---

[2] Notably, the Meta Pixel works in conjunction with its Conversion API tool and, as a result, Defendant transmits one copy of its digital subscribers' viewing information directly from its web server to Meta's web servers. Additional copies of this information are communicated through the use of cookies.

transactions and occurrences that gave rise to the action under federal law. This Court further has jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, there are more than 100 members of the Class and California Subclass, and there is minimal diversity.

9.      This court has general personal jurisdiction over Defendant because Defendant's principal place of business is in this District.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant resides in this District.

## FACTUAL ALLEGATIONS

**A.      History And Overview Of The VPPA**

11.     The origins of the VPPA began with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court. During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper which then published that record. With an eye toward the digital future, Congress responded by passing the VPPA. As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

12.     Accordingly, the VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information ("PII") as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental,

sale, or delivery of prerecorded video cassette tapes or similar audio visual materials."  18 U.S.C. § 2710(a)(4).

13.    Individuals who are "aggrieved" by a violation of the VPPA may bring an action for "not less than liquidated damages" of $2,500 per violation, in addition to other remedies.  18 U.S.C. §§ 2710(c)(1)-(2).

**B.    Overview Of California Civil Code § 1799.3**

14.    Along a similar vein, the California Legislature enacted Cal. Civ. Code § 1799.3 which prohibits a "person providing video recording sales or rental services" from disclosing "any personal information or the contents of any record, including sales or rental information, which is prepared or maintained by that person, to any person, other than the individual who is the subject of the record, without the written consent of that individual."

15.    Cal. Civ. Code § 1799.3 provides a wider breadth of protection compared to the VPPA because it does not require that the information disclosed by video recording sales or rental service providers be *identifiable* to any one particular person.  Instead, the statute forbids the disclosure of generalized "personal information" without that person's consent, even if that information does not serve to identify them.  The statute also forbids the disclosure of "the contents of any record, including sales or rental information," such as the mere title of the video a subscriber watches.  We know the statute independently forbids the "contents of any record," from being disclosed without consent because the phrase is preceded by the word, "or" – not "and."  Under California law, "the plain and ordinary meaning of the word 'or,' when used in a statute, is to designate separate, disjunctive categories.  The word 'or' suggests alternatives.  In its ordinary sense in a statute, the function of the word 'or' is to mark an alternative such as 'either this or that.'"  *In re E.A.*, 24 Cal. App. 5th 648, 661 (2018) (citations omitted) (internal quotation marks omitted).

16.    Under Cal. Civ. Code § 1799.3(c), Plaintiff and Class Members may seek injunctive statutory damages of $500 per violation.

1

### C.    Overview Of The Meta Pixel

2    17.    Facebook is the largest social networking site on the planet, touting 2.9 billion

3    monthly active users.[3]  Facebook describes itself as a "real identity platform,"[4] meaning users are

4    allowed only one account and are encouraged to share "the name they go by in everyday life."[5]  To

5    that end, when creating an account, users provide their first and last name, along with their

6    birthday, gender, and phone number or email address.[6]

7    18.    Meta owns Facebook.com and generates revenue by selling advertising space on its

8    website, and other applications it owns, like Instagram.[7]

9    19.    Meta sells advertising space by highlighting its ability to target users.[8]  Meta can

10    target users effectively because it surveils user activity both on and off its site.[9]  This allows Meta

11    to make inferences about users beyond what they explicitly disclose, like their "interests,"

12    "location," and "demographics."[10]  Meta compiles this information into a generalized dataset called

13    "Core Audiences," which advertisers use to apply highly specific filters and parameters for their

14    targeted advertisements.[11]

15
16    [3] Sean Burch, *Facebook Climbs to 2.9 Billion Users, Report 29.1 Billion in Q2 Sales*, YAHOO! (July 28, 2021), available https://www.yahoo.com/now/facebook-climbs-2-9-billion-202044267.html (last accessed June 21, 2024).

17
18    [4] Sam Schechner & Jeff Horowitz, *How Many Users Does Facebook Have? The Company Struggles to Figure it Out*, Wall St. J. (Oct. 21, 2021) available https://www.wsj.com/articles/how-many-users-does-facebook-have-the-company-struggles-to-figure-it-out-11634846701 (last accessed June 21, 2024).

19
20    [5] META, *Community Standards, Part IV Integrity and Authenticity,* available https://www.facebook.com/communitystandards/integrity_authenticity (last accessed June 21, 2024).

21    [6] META, *Sign Up*, available https://www.facebook.com/ (last accessed June 21, 2024).

22    [7] Mike Isaac, *Facebook Profit Surges 101 Percent on Strong Ad Sales*, N.Y. TIMES (July 28, 2021) available https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html (last accessed June 21, 2024).

23
24    [8] META, *Why Advertise on Facebook, Instagram and other Meta Technologies*, available https://www.facebook.com/business/help/205029060038706 (last accessed June 21, 2024).

25    [9] META, *About Meta Pixel*, available https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last accessed June 21, 2024).

26
27    [10] META, *Audience Ad Targeting*, available https://www.facebook.com/business/ads/ad-targeting (last accessed June 21, 2024).

28    [11] META, *Easier, More Effective Ways to Reach the Right People on Facebook*, available https://www.facebook.com/business/news/Core-Audiences (last accessed June 21, 2024).

20.     Businesses can also build "Custom Audiences."[12]  Custom audiences enable businesses to reach "people who already know [their] business," because Meta can track whether they're loyal customers or people who have used a particular business' app or visited their website.[13]  Businesses can use Custom Audiences to target existing customers directly, or they can use it to build "Lookalike Audiences," which "leverage[] information such as demographics, interests, and behaviors from your source audience to find new people who share similar qualities."[14]  Unlike Core Audiences, Custom Audiences require an advertiser to supply the underlying data to Meta.  They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools," which collect and transmit the data automatically.[15]  One such Business Tool is the Meta Pixel.

21.     The Meta Pixel is a piece of code that businesses, like Defendant, can integrate into its Website.  Once activated, the Meta Pixel "allows [the site] to track visitor activity on [their] website."[16] When the Meta Pixel captures an action, it sends a record to Facebook.  Once this record is received, Meta processes it, analyzes it, and assimilates it into datasets like the Core Audiences and Custom Audiences.

22.     Businesses control what actions—or, as Meta calls it, "events"—the Meta Pixel will collect on that business's site, including the website's metadata, along with what pages a consumer

---

[12] META, *Create a website custom audience*, available https://www.facebook.com/business/help/1474662202748341?id=2469097953376494 (last accessed June 21, 2024).
[13] META, *Audience ad targeting*, available https://en-gb.facebook.com/business/ads/ad-targeting (last accessed June 21, 2024).
[14] META, *About Lookalike Audiences*, https://www.facebook.com/business/help/164749007013531?id=401668390442328 (last accessed June 21, 2024).
[15] META, *Create a Customer List Custom Audience*, available https://www.facebook.com/business/help/170456843145568?id=2469097953376494; *See Also* Meta, *Create a Website Custom Audience*, available https://www.facebook.com/business/help/1474662202748341?id=2469097953376494 (last accessed June 21, 2024).
[16] META, *Meta Pixel*, available https://developers.facebook.com/docs/meta-pixel/ (last accessed June 21, 2024).

---

views.[17] Businesses can also configure the Meta Pixel to track other events. Meta offers a menu of "standard events" from which businesses can choose to track, including what content a consumer views or purchases.[18] An advertiser can also create their own tracking parameters by building a "custom event."[19]

23.     Likewise, businesses using the pixel on their website control how the Meta Pixel identifies consumers. The Meta Pixel is configured to automatically collect "HTTP Headers" and "Pixel-specific Data."[20] The HTTP Headers collect "IP addresses, information about the web browser, page location, document referrer and persons using the website."[21] Pixel-specific Data includes "the Pixel ID and Cookie."[22]

24.     The Meta Pixel, like website cookies generally, attaches to the browser that the user uses to access their Facebook account. That cookie then follows the user's web activity occurring within that same browser. For example, if the user accesses Facebook.com through their Safari browser, then moves to reelshort.com after leaving Facebook, the Meta Pixel will continue to track that user's activity on that browser.

**D.     Defendant is a Video Tape Service Provider**

25.     Defendant owns and operates ReelShort, a video streaming service that features pre-recorded, on-demand series for streaming.[23]

---

[17] *See* META, *Meta Pixel, Accurate Event Tracking, Advanced*, available https://developers.facebook.com/docs/facebook-pixel/advanced/; See also Facebook, Best Practices for Facebook Pixel Setup, https://www.facebook.com/business/help/218844828315224?id=1205376682832142 (last accessed June 21, 2024).

[18] META, *Specifications for Facebook Pixel Standard Events*, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last accessed June 21, 2024).

[19] META, *About Standard and Custom Website Events*, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (last accessed June 21, 2024).

[20] META, *Meta Pixel*, https://developers.facebook.com/docs/facebook-pixel/ (last accessed June 21, 2024).

[21] *Id.*

[22] *Id.*

[23] REELSHORT, *Genre*, available https://www.reelshort.com/movie-genres/all-movies (last accessed February 21, 2025).

26.    Consumers can create an account to access the videos.  Eventually, consumers are either prompted to pay or to watch ads to access more episodes.  If consumers choose to pay to view more videos, they can pay for one-time purchases of coins, of varying quantities, to access more videos.[24]

27.    Consumers can also subscribe weekly to the app to gain unlimited access to the Defendant's video library.[25]  For weekly access, consumers are charged $19.99.[26]

28.    Upon signing in, the consumer is presented with a wall of content, advertising ReelShort shows and new releases (*see* Figure A):



*Figure A*

---

[24] *See* REELSHORT, *Top Up*, https://www.reelshort.com/shopping (page on the Website where consumers can purchase coins for varying amounts in order to access more video content).

[25] *See* SENSOR TOWER, *ReelShort - Short Movie & TV*, available https://app.sensortower.com/overview/1636235979?country=US.

[26] *Id.*; APPLE, *App Store Preview: ReelShort*, https://apps.apple.com/us/app/reelshort-short-movie-tv/id1636235979.  While this Complaint does not include Defendant's mobile application, this source nonetheless explains the available purchases for the service.  It lists the subscription price as $19.99.

29.     Therefore, Defendant sells or rents access to its library of pre-recorded videos to consumers and delivers its pre-recorded videos to consumers via the ReelShort Website, making it a video tape service provider under the VPPA and a "person providing video recording sale or rental services" under Cal. Civ. Code § 1799.3(a).

**E.      ReelShort and the Meta Pixel**

30.     Unbeknownst to Defendant's consumers, ReelShort knowingly discloses users' video histories to Meta.

31.     The ReelShort Website hosts the Meta Pixel, which transmits events to Meta.  When a consumer watches a video on ReelShort, the Meta Pixel first generates a PageView event that discloses a webpage's Universal Resource Locator ("URL") containing the video title the consumer has requested and viewed.  That information is disclosed to Meta as shown in Figures B and C.

32.     In Figures B and C, for example, the if a user watches an episode of the ReelShort movie *Wrong Marriage, Fated Groom*, the name of the movie and the episode number appears in the URL.  That URL is then captured by the Meta Pixel and disclosed to Meta.

1
2
3
4
5
6
7
8
9
10
11
12
13



*Figure B*

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



*Figure C*

33.    The Meta Pixel also generates a View Content event that discloses the same

information to Meta.  *See* Figure D.



***Figure D***

34.    When Defendant discloses the video titles of the ReelShort videos consumers view

to Meta, Meta also receives a consumer's unencrypted Facebook ID along with the video title of

the video the consumer is watching on ReelShort. Meta obtains this Facebook ID through its c_user cookie.

35.      The c_user cookie is personally identifiable information because it contains a consumer's unencrypted Facebook ID. A Facebook ID allows anybody—not just Facebook—to identify the individual ReelShort subscriber with a Facebook account. If one types www.facebook.com/[facebook ID] into a web browser, it will load the individual's Facebook page.

36.      The Meta Pixel transmits additional cookies to Meta.

37.      The fr cookie, active on Defendant's site, contains, at least, an encrypted Facebook ID and browser identifier.[27] Facebook, at a minimum, uses the fr cookie to identify particular users.[28]

38.      Without a corresponding Facebook ID, the fr cookie contains, at least, an abbreviated and encrypted value that identifies the browser. Facebook uses this for targeted advertising.

39.      The Meta Pixel uses both first- and third-party cookies. A first-party cookie is "created by the website the user is visiting"—i.e. reelshort.com.[29] A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—i.e., Facebook.[30]

40.      Meta, at a minimum, uses the fr and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.

41.      Through the Meta Pixel's code, these cookies combine the identifiers with the event data, allowing Meta to know, among other things, what ReelShort consumers are requesting and watching for entertainment.

---

[27] DATA PROTECTION COMMISSIONER, Facebook Ireland Ltd, Report of Re-Audit (Sept. 21, 2012), available http://www.europe-v-facebook.org/ODPC_Review.pdf

[28] META, Cookies & Other Storage Technologies, https://www.facebook.com/policy/cookies/ (last accessed June 27, 2024).

[29] PC MAG, First Party Cookie, available https://www.pcmag.com/encyclopedia/term/first-party-cookie (last accessed June 27, 2024).

[30] PC MAG, First Party Cookie, available https://www.pcmag.com/encyclopedia/term/first-party-cookie (last accessed June 27, 2024).

42.     By compelling a visitor's browser to disclose the c_user and fr cookies alongside event data for videos, Defendant knowingly discloses information sufficiently permitting an ordinary person to identify a specific individual's video viewing behavior.

43.     Defendant disclosed Plaintiff's video viewing behavior as she viewed videos on the Website, alongside her Facebook ID, as described in the examples above.

## CLASS ALLEGATIONS

44.     **Nationwide Class.**  Plaintiff Porcuna seeks to represent a class of similarly situated individuals defined as:

> All persons in the United States who have a Facebook account, have a ReelShort account, and watched ReelShort videos on the reelshort.com Website using the same browser the person uses to access their Facebook account.

45.     **California Subclass.**  Plaintiff Porcuna also seeks to represent a California Subclass defined as:

> All persons in California who have a ReelShort account and watched ReelShort videos on the reelshort.com Website and had their video-viewing information disclosed to a third party (the "California Subclass").

46.     The Class and California Subclass shall be collectively referred to as the "Classes."

47.     Subject to additional information obtained through further investigation and discovery, the above-described Classes may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

48.     **Numerosity (Fed. R. Civ. P. 23(a)(1)):** At this time, Plaintiff does not know the exact number of members of the Classes. However, given the popularity of Defendant's Website, the number of persons in the Classes is believed to be so numerous that joinder of all members is impracticable.

49.     **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):** There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Classes that predominate over questions that may affect individual members of the Classes include but are not limited to:

   (i)      Whether Defendant collected Plaintiff's and the Class Members' PII;

   (ii)     Whether Defendant disclosed Plaintiff's and the Classes' PII to Meta in violation of the VPPA and Cal. Civ. Code § 1799.3;

   (iii)    Whether Defendant's disclosures were committed knowingly and intentionally; and

   (iv)    Whether Defendant disclosed Plaintiff's and the Classes' PII without their consent.

50.    **Typicality (Fed. R. Civ. P. 23(a)(3)):** Plaintiff's claims are typical of those of the Classes because Plaintiff, like all members of the Classes, watched pre-recorded videos on the Website, and had her PII and video-viewing information disclosed to third parties.

51.    **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including VPPA and Cal. Civ. Code § 1799.3 actions.  Plaintiff and her counsel are committed to vigorously prosecuting this class action.  Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Classes.  Neither Plaintiff nor her counsel have any interest adverse to, or in conflict with, the interests of the absent members of the Classes. Plaintiff has raised viable statutory claims, or the type reasonably expected to be raised by members of the Classes and will vigorously pursue those claims.  If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Classes, additional claims as may be appropriate, or to amend the definition of the Classes to address any steps that Defendant took.

52.    **Superiority (Fed. R. Civ. P. 23(b)(3)):** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Classes is impracticable.  Even if every member of the Classes could afford to pursue individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent, or contradictory

1   judgments, and would magnify the delay and expense to all parties and to the court system

2   resulting from multiple trials of the same factual issues.  By contrast, the maintenance of this action

3   as a class action, with respect to some or all of the issues presented herein, presents few

4   management difficulties, conserves the resources of the parties and of the court system and protects

5   the rights of each member of the Classes.  Plaintiff anticipates no difficulty in the management of

6   this action as a class action.

### CAUSES OF ACTION

### COUNT I
### Violation Of The VPPA
### 18 U.S.C. § 2710, *et seq.*
### (On Behalf of Plaintiff and the Class)

53.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

54.     Plaintiff brings this claim individually and on behalf of the members of the

proposed Class against Defendant.

55.     Defendant is a "video tape service provider" as defined by the VPPA because it

"engage[s] in the business, in or affecting interstate or foreign commerce, of rental, sale, or

delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C.

§ 2710(a)(4).  In particular, Defendant provides a library of audiovisual material to consumers

either for free with ads, or for a monthly fee.

56.     Plaintiff and Class members are "consumers" as defined by the VPPA because they

created ReelShort accounts to watch Defendant's video content.  18 U.S.C. § 2710(a)(1).

Specifically, Plaintiff created a ReelShort account to access Defendant's library of pre-recorded

video content.  To create an account, users like Plaintiff can choose to sign up through Google,

Facebook, or Apple.  Under any of these methods, they share their names and email addresses with

Defendant.  To unlock videos that require payment, or obtain weekly passes, users like Plaintiff

also provide their credit card information.  In so doing, they also share their IP addresses and

cookies associated with their devices as well.  Under the VPPA, therefore, Plaintiff Class members

are "subscribers" of "goods or services from a video tape service provider."  *See* 18 U.S.C. §

2710(a)(1).  Moreover, Class members who purchase specific episodes or weekly passes are also

"renters" or "purchasers" of "goods or services from a video tape service provider."  *See* 18 U.S.C. § 2710(a)(1).

57.    Defendant disclosed to a third party, Meta, Plaintiff's and the Class Members' personally identifiable information.  Defendant installed the Meta Pixel on its Website to compel Plaintiff's browsers to transfer their personally identifying information in the form of their Facebook ID, along with event data like the title of the video they viewed, to Meta.

58.    Plaintiff and the members of the Class viewed and accessed the videos using their ReelShort accounts.

59.    Defendant knowingly disclosed Plaintiff's PII because it installed the Meta Pixel on its Website and controlled its functionality.

60.    Plaintiff and the members of the Class did not provide Defendant with adequate consent—either written or otherwise, "in a form distinct and separate from any form setting forth other legal or financial obligations"[31]—to disclose their PII and event data to third parties.

61.    Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA. Specifically, Defendant's disclosures to Meta were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

62.    On behalf of herself and the members of the Class, Plaintiff seeks: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of the Plaintiff and the Class by requiring Defendant comply with the VPPA's requirement for protecting a consumer's PII; (3) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (4) reasonable attorneys' fees and costs and other litigation expenses.

**<u>COUNT II</u>**
**Violation of California Civil Code § 1799.3**
**(On Behalf of Plaintiff, the Nationwide Class, and the California Subclass)**

63.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

---

[31] 18 U.S.C. § 2710(b)(2)(B)(i).

64.    Plaintiff brings this claim individually and on behalf of the members of the proposed Nationwide Class and California Subclass against Defendant.

65.    Cal. Civ. Code § 1799.3(a) prohibits a "person providing video recording sale or rental services" from disclosing "any personal information or the contents of any record, including sales or rental information, which is prepared or maintained by that person, to any person, other than the individual who is the subject of the record, without the written consent of that individual."

66.    Defendant is a "person providing video recording sales or rental services" because it sells access to its online platform via its Website where Defendant provides access to pre-recorded video content.  Alternatively, Defendant rents access to their library of videos by charging a weekly subscription fee of $19.99 or charging consumers per view of the videos.

67.    Defendant disclosed to a third party, Meta, Plaintiff's and Class members' personal information.  Defendant utilized the Meta Pixel to compel Plaintiff's and Class members' browsers to transfer Plaintiff's personal information, like their Facebook ID, and event data, such as the title of the videos they viewed, to Meta.

68.    Plaintiff and the Subclass members viewed and accessed the videos on ReelShort by using their ReelShort accounts.

69.    Defendant knowingly disclosed Plaintiff's and Class members' PII because it used the data and installed the Meta Pixel in the background of its Website for targeted advertising and remarketing.

70.    Plaintiff, the Nationwide Class, and California Subclass members did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to third parties.

71.    On behalf of herself, the Nationwide Class, and the California Subclass, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as necessary to protect the interests of Plaintiff and the Subclass by requiring that Defendant complies with Cal. Civ. Code § 1799.3's requirements for protecting a consumer's PII; (iii) statutory damages of $500 for each violation of this law pursuant to Cal. Civ. Code § 1799.3(c), and (iv) reasonable attorneys' fees and costs and other litigation expenses.

1

## **PRAYER FOR RELIEF**

2          WHEREFORE, Plaintiff seeks a judgment against Defendant, on behalf of herself and all

3    others similarly situated, as follows:

4          (a)    For an order certifying the Classes pursuant Fed. R. Civ. P. 23,
                  naming Plaintiff as representative of the Classes, and naming
5                  Plaintiff's attorneys as Class Counsel to represent the Classes;

6          (b)    For an order declaring that Defendant's conduct violates the
7                  statutes referenced herein;

8          (c)    For an order finding in favor of Plaintiff and the Classes on all
9                  counts asserted herein;

10         (d)    An award of statutory damages to the extent available;

11         (e)    For punitive damages, as warranted, in an amount to be
12                 determined at trial;

13         (f)    For prejudgment interest on all amounts awarded; and

14         (g)    For an order awarding Plaintiff and the Classes their
15                 reasonable attorneys' fees and expenses and costs of suit.

16                            **JURY TRIAL DEMAND**

17         Plaintiff demands a trial by jury of any and all issues so triable.

18    Dated: March 10, 2025                    Respectfully submitted,

19                                             **BURSOR & FISHER, P.A**.

20                                             By:   */s/ Stefan Bogdanovich*
21                                                    Stefan Bogdanovich

22                                             L. Timothy Fisher (State Bar No. 191626)
                                               Stefan Bogdanovich (State Bar No. 324525)
23                                             Ines Diaz Villafana (State Bar No. 354099)
                                               1990 North California Blvd., 9th Floor
24                                             Walnut Creek, CA 94596
                                               Telephone:  (925) 300-4455
25                                             Facsimile:   (925) 407-2700
                                               Email:  ltfisher@bursor.com
26                                                      sbogdanovich@bursor.com
27                                                      idiaz@bursor.com

28                                             *Attorneys for Plaintiff*